# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00068-CR

---

**Jordan Smart, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 426TH DISTRICT COURT OF BELL COUNTY
### NO. 83577, THE HONORABLE STEVEN J. DUSKIE, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Jordan Smart was convicted by a jury of murder and sentenced to 99 years' confinement. *See* Tex. Penal Code § 19.02. In two issues, he contends that the trial court abused its discretion by admitting videos depicting the victim's condition prior to his death and by excluding inculpatory statements made by Smart's former girlfriend, Victoria Orr. We affirm the trial court's judgment of conviction.

## BACKGROUND

Smart was indicted for the murder of his housemate, Bryan Story. On May 24, 2020, Story and a third housemate, Donald Armstead, were struck by a vehicle in the parking lot of a CEFCO gas station in Killeen, Texas. Story died from his wounds on December 12, 2020.

At trial, the State presented testimony from 15 witnesses, including Orr; Story's stepmother, Tiffiney Story (Tiffiney); CEFCO's director of loss prevention; a fourth housemate, James Keane; Smart's aunt, Rebecca Blaise; Dr. Taylor Ratcliff; and various first responders and members of law enforcement. The State's exhibits included a "Day in the Life" video depicting Story's condition and injuries shortly before his death, a second video showing fluid draining from a wound on his head, hospital photographs of Story and Armstead, their medical records, CEFCO surveillance footage, and video of Smart's interviews with police. Smart testified in his own defense and offered a written statement made by Orr into evidence.

Keane testified about the events leading up to the collision. On May 24, 2020, he was visiting friends at their house on Elkins Circle in Killeen. The house's residents included Story, Orr, Armstead, Leanna Salazar, and Kevin Bell. Smart and Orr, who lived in a detached residence behind the house, faced an eviction effort by the other residents. At some point, Keane left, and a fight broke out between Smart and Armstead, who had to be pulled apart.[1] When Keane returned that night, he saw that the kitchen had been "destroyed" and observed Smart in the driveway "digging through" the back of Smart's white Dodge Nitro. Keane testified that the Nitro belonged to Smart, that he drove it "frequently," and that Orr did "[n]ot really" drive it."

Approximately five-to-ten minutes later, Smart came to the house's backdoor carrying a baseball bat and "want[ing] to fight [Armstead] again." The confrontation ended when Smart put down the bat, and Story and Armstead left on foot for the CEFCO, which was a "3-minute walk" from the house. However, Smart then attempted to set fires in Armstead's room and the garage, repeating, "Donald, mistakes you made, the mistakes you made." Keane

---

[1] Keane did not explain how he learned of the fight.

put out the fires with a hose, and Smart left alone in the Nitro after stating, "I'll be back. I'll be back."

When he heard sirens, Keane went to the CEFCO to check on Armstead. On arriving, he saw Story lying in the parking lot and was asked to leave by police. Instead, he went inside the CEFCO, where he found Armstead.

Killeen Fire Department firefighter-paramedic Colby Kwolek and Killeen Police Department (KPD) Officers Jimmy Patterson, Regan Rollins-Vanvalkenburg, and Robert Wade each testified about his or her observations on responding to the CEFCO following multiple 911 calls. They observed that Story was lying on his back in the parking lot, that he had what appeared to be blood around his head, and that his breathing was loud and labored. Kwolek testified that such "agonal breathing" signified that Story could not maintain his airway. He also testified that Story's pupils were nonreactive, that he exhibited posturing indicative of a severe spinal cord injury, that he had to be intubated, and that he scored a 3—the lowest score—on the Glasgow Coma Score. Rollins-Vanvalkenburg testified that Story was unconscious, and Wade testified that he appeared to be "gravely injured." Inside the CEFCO, Wade questioned Armstead, who was bleeding from the head but told Wade that he and Story had been struck by a white Dodge Nitro. Armstead did not know how many people were inside the vehicle or who was driving. Patterson observed "white-in-color car parts," including a fender, headlight, and mirror, in a "trail leading north" to a knocked-down tree and "messed-up ground."

Dr. Ratcliff, an ER doctor at Baylor, Scott & White (BSW) testified to the extent of Story's and Armstead's injuries and to his treatment of Story. Armstead's primary injury was a broken clavicle, but Story was "critically ill" and suffered a "traumatic brain injury," rib fracture, transverse-process spine fractures, and "multiple types of bruises and bleeding and

3

injury to his brain." Although Story's toxicology screen indicated that he was positive for amphetamines and benzodiazepines, Ratcliff testified that an overdose "would not have had anything to do with this." Because of the severity of Story's injuries, doctors removed a portion of his skull; installed a permanent shunt to drain cerebrospinal fluid (CSF); placed a feeding tube into his stomach; and performed a tracheostomy, which is "a small hole or breathing tube . . . in the windpipe; the trachea, to be able to use home ventilators." Story was eventually discharged to neuro rehab but could not eat, go to the bathroom, or get into bed by himself. While it appeared that he made some improvements, he was readmitted to BSW when the previously removed portion of his skull became infected. The bone was replaced with a plastic implant, and he was released again.

Shown the close-up video of Story's head wound, Ratcliff testified that it appeared to be an ulcerated hole surrounded by chronically ulcerated skin tissue. The fluid leaking from the wound was "a combination of pus from infection and [CSF]," suggesting "a communication between the outside world . . . and the inside of his cranial skull where his brain is." This communication, Ratcliff testified, "is an invitation for all of the bacteria and viruses and fung[i] and everything else that lives out here with us to get inside of the body." He also testified that the implant was visible in a portion of the video, causing him concern "that bacterial infection has already set up around the brain and that [Story] c[ould] easily develop" a brain or spinal-cord infection.

Orr testified regarding her relationship with Smart; the events of May 24, 2020; and her involvement in the subsequent investigation. She and Smart met in high school, dated "on and off" from 2017 to May 2020, and were in a relationship at the time of the charged offense. In 2018, while pregnant, she was involved in a car accident and lost her pregnancy.

4

The accident affected her willingness to drive at the time of the collision in this case when she was pregnant with Smart's child. She testified that the 2018 accident had made her "more reluctant" and that she became "terrified" and "completely stopped driving" after a fender bender around the end of March or beginning of April 2020.

She also testified that she owned the white Dodge Nitro, which Smart would drive. On May 24th, he drove them to the Elkins residence in the late afternoon or evening to finish collecting their belongings. Once they arrived, she took a nap in their detached room because she was suffering from medical issues related to her pregnancy as well as a "come-down" from methamphetamine and marijuana that she had ingested the day before. Smart also ingested methamphetamine on the 23rd, and, because he was "jittery," she assumed that he had ingested more on the 24th. She did not observe an altercation involving Smart but recalled that Armstead was at the house. She next remembered Smart waking her from her nap and telling her in a "frantic" tone, "Get in the car, we need to go now." She got into the front passenger's seat of the Nitro, and he got into the driver's seat approximately 10-to-15 seconds later.

Although she had been drowsy, she recalled him saying something, the car accelerating, and her feeling a "bump onto the curb." She "hear[d] thumping, hit the car, [] w[o]ke up," and turned around to see "one body on the ground." Following the collision, Smart "zoom[ed] behind the CEFCO," stopped in a residential area, pulled a damaged part off of the front fender, and drove to his friend's house in Harker Heights. At some point, he told her that "Bryan, Donald, and two other people . . . had jumped him" in the Elkins residence" and that she and he "weren't there and [they] don't know anything. Basically, just play the stupid little white

girl like you usually do." His face was "very swelled up, and it looked like he had a footprint on his face."

The following day, he drove her to his grandfather's house in the Nitro and told her to "sign whatever he told [her] to sign and don't ask questions." Police interviewed her at the house, but she was evasive and denied knowing what had happened, who had been driving, or where the keys to the Nitro were. She next spoke with officers and made a written statement on March 26, 2021, after learning that Smart was "trying to pin this crime on [her]." She told them "everything except for the fact that she was using drugs during the pregnancy," which she testified she had admitted for the first time at trial. Until she provided the March statements, she had been communicating with Smart while he was in jail. On cross-examination, she testified that she had told officers that she always wears a seatbelt, that no one had shown her a crash-data report indicating that the front passenger's seatbelt was unbuckled at the time of the charged offense, and that she "guess[ed she] did not have [her] seat belt on that night."

KPD Officer Brett Boynton testified about his interview of Smart at his grandfather's house on May 25, 2020. The Nitro, which was present, was damaged on its front. Orr was "uncooperative and passive," and Smart's grandfather was "definitely trying to protect his grandson." Eventually, Smart arrived in a silver sedan, and Boynton noticed that he had a bruise on his face "maybe sustained in a fight or vehicle accident." During the interview, Smart's answers "would change at times to questions that he was asked," and he appeared "skittish." A relative of Smart's, driving a Chevrolet Tahoe, brought the Nitro's key, and Orr gave officers permission to take the vehicle.

Smart's aunt, Rebecca Blaise, testified concerning a vehicle swap that he proposed to her. He had offered her two vehicles—a silver car and the white Nitro—for her

6

2004 Tahoe. She thought it was a good deal and had intended to accept. On May 25, 2020, she, Smart, and two others drove to an H-E-B in Belton to collect the silver car, which had a flat tire. After patching it, they returned to her father's house.

KPD Officer James Gowers, who served as the lead investigator on the case, testified about the actions that he took as part of the investigation. He responded to the CEFCO on May 24, 2020, and observed shoes, a baseball cap, a fender from a wheel well, a mirror, and marks in the grassy area between the sidewalk and parking lot. He also interviewed Armstead and Smart and reviewed officers' reports and body-camera video. Next, he generated a crash data report for the Nitro and discovered one event logged on the module. However, because the Nitro's mileage on May 25th was 2,235 miles greater than its mileage at the time of the event, he determined that the recorded event was unrelated to the collision with Story and Armstead and that any "information about seat belts or who's wearing [them] or who's not" would be irrelevant to the charged offense. Gowers testified that Orr had not mentioned being in the vehicle when speaking with officers on May 25th, that he first learned that she may have been in the vehicle from Smart in June 2021,[2] and that Orr was not "coming clear with [police] with everything."

Reviewing footage of the collision from the CEFCO's surveillance cameras, Gowers testified that the Nitro's driver appeared to be male, that the driver "t[ook] up most of the driver seat area," that he would be "a larger person," and that he was wearing "a dark colored shirt, probably brown." He testified that Smart is "significantly taller" and "kind of bigger" than Orr. Gowers also reviewed photographs of Story in the hospital and testified that they depicted

---

[2] Although Gowers testified that Smart's June 11th interview "was the first time that anyone had said that Ms. Orr was in the vehicle," Orr acknowledged that she had been in the Nitro during the collision in her March 2021 written statement.

7

"road rash," "some swelling," and "some lacerations." In the photographs, Story was intubated and wearing a neck brace.

Regarding the events at the Elkins residence, Gowers testified that Salazar had told him that her mother owned the property and was trying to evict Smart. He testified that "some folks" had said that Smart started a fight at the house but that Smart and Orr were "saying the four men jumped Mr. Smart."

Lastly, Gowers testified about the contents of a letter written by Smart to a woman named Kearesten Patterson on June 28, 2021. In the letter, Smart wrote, "I'm thinking this is a full-on slam dunk. Check this shit." He stated that his housemates had set fire to the house "after jumping [him] didn't work"; that Keane and "Steven"[3] remained in the house when Smart "pulled off"; that after leaving the residence, he went "straight to Victoria to get her to safety"; that she "screamed when she saw [Story and Armstead] walking"; that his "protect[ive ins]tincts kick[ed] into overdrive"; that he had "finally figured it all out"; and that he "did what it took to keep [Orr] safe from all of these attacks." Gowers testified that to "pull off" means "you're driving."

Smart, the defense's only witness, provided an account of the collision, the events preceding it, and his actions afterward. He explained that he "lay[s] claims" to the Nitro because he often had to work on it as a mechanic. However, it was registered to and insured by Orr, who drove it regularly to work; he, alternatively, drove it when they "were together, [they] went on dates, things of that sort, to the store." Moreover, he had his own vehicles, including a 1994 Chevrolet Sierra, a 2007 Hyundai Sonata, and a Honda motorcycle. He was not aware of

---

[3] Steven is not mentioned elsewhere in the record.

the Nitro having previously been in a fender bender and had not noticed any damage to it before the collision. He testified that no accident was reported to him or to "our insurance."

On May 24, 2020, he and Orr went to the Elkins residence to clear their belongings out of the back room. He told Orr that she needed to eat something and went into the kitchen to make oatmeal. Armstead entered, looked at him "really furiously," and hit him. Smart began to defend himself, and Story, Bell, and Keane "jumped in from the living room." Story was "part of the physical confrontation" and caused the boot mark to Smart's face. Although Smart initially testified that, during the fight, Orr was awake and coming down from drug use in the back room, he later testified that she had been sleeping. He explained that she had ingested methamphetamine and marijuana and that he smoked synthetic marijuana earlier in the day.

Eventually, he was able to escape his attackers and ran to his Sonata, which was locked. He then ran to the back room, and Orr asked him what was happening. He told her to get in "her car," which was parked behind the Sonata. He got into the Nitro moments after; Orr was in the driver's seat, and he was in the front passenger's seat with their bags in his lap. She "had the keys with her on her person," "inserted the key into the ignition," and drove toward the CEFCO. As he was telling her what had happened in the main house, he noticed Story and Armstead running toward the store and mentioned it to her. She "screamed and veered . . . to the right-hand side where she proceeded to strike." It happened so fast that he "didn't really have a reaction" but was "in utter shock" and "scream[ed] out . . . [i]n fear." Orr was "yelling" and "cursing," and he screamed, "Oh, my God, what did you do?" He grabbed the steering wheel, told her to stop, and asked her, "Are you crazy? . . . What did you do?" After attempting to exit the parking lot, she at last parked, and, as he was walking around to the driver's side, he "noticed

9

that something was hanging off" and "pulled it off and put it in the vehicle with no intention of hiding the evidence." At first, he drove straight, but when he tried to return to the CEFCO, she grabbed his arm and said, "No, no, no, no," so he turned.

On cross-examination, Smart testified that he had previously been convicted of assault family violence, unauthorized use of a motor vehicle, theft, and harassment of a public servant. He testified that he was not driving the Nitro during the collision but that he "agree[d] to all of the other elements" and "believe[d] everything else contained in [the indictment]." He testified that he had repeatedly told Boynton during the May 25, 2020, interview that he was the Nitro's only driver because Orr does not drive well, and he considers the Nitro a "family vehicle." He also testified that he had told officers that only he had a key to the vehicle and that no one had driven "[his] vehicle but [him]." However, he then testified that there were actually two keys and that he had taken Orr's after she struck Story and Armstead. Although he had tried to trade the Nitro to his aunt after the collision, he testified that it was because he could not "drive two vehicles" and "not mainly" because "it had been used in a murder."

He further testified that he had tried to prevent Orr from cooperating with the investigation and that he had warned her against "dry snitching" because his understanding is that "snitching" and "ratting" mean "I've done nothing and somebody else is ratting on me for something that I didn't do." He testified that he had had "a lot of theories about this case since May 24th"; initially feigned ignorance; first told officers that he had left the Elkins residence on foot; next said that Patterson picked him up; had changed his story when told that she was not going "to back [it] up"; and had lied about the Nitro being stolen. Similarly, he testified that he had been "trying to put distance between [him]self and the murder weapon" by telling officers during the June 2021 interview that he did not drive the Nitro; that he "could be" seen as "the

10

one with motive in this case"; that he had not visited Story or Armstead in the hospital because he was "stranded" without a vehicle; that he had told Orr in a jail call that he had been driving; that he had stated on the call that he ran over Story and Armstead in self-defense; and that he lied about killing them to cover for her. With respect to the letter he wrote Patterson, he testified that "pulled off" does not necessarily mean that he drove and that, by calling the case a "slam dunk," he was trying to keep a positive attitude.

Tiffiney, a surgical trauma ICU nurse and the State's first witness, testified about her stepson's health struggles and death following the collision. After his first release from BSW, Story could not communicate, feed himself, or take care of himself. Within a month of his second release, he entered hospice care at his parents' home in Arkansas. Approximately two weeks before his death, he began to have "some sort of noticeable issue with his head." Tiffiney described his head wound and infection and explained the contents of both videos of him to the jury, testifying that the Day in the Life video depicted "his general, physical condition" "shortly before his death." She testified that Story died "as a result of his injuries," which "just kept getting worse."

On cross-examination, she testified that she did not know for sure whether Story's infection resulted from the skull implant. She also testified that during his first stay at BSW, he had 21 teeth removed because of an infection that may have resulted from his drug use but that was unrelated to the collision. She testified that she did not recall anyone mentioning sepsis but that Story "would definitely be subject to that."

The jury convicted Smart of murder and, following a hearing on punishment, sentenced him to 99 years' confinement. This appeal followed.

11

## STANDARD OF REVIEW

On appeal, Smart challenges the trial court's decision to admit certain evidence at trial. We review a trial court's decision to admit evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *see Dabney v. State*, 492 S.W.3d 309, 316 (Tex. Crim. App. 2016). An abuse of discretion occurs when the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). In other words, we may not reverse the trial court's ruling unless the "decision falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *see also Henley*, 493 S.W.3d at 83. An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93 (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

## DISCUSSION

### I. Day in the Life and Close-Up Videos

In his first issue, Smart contends that the trial court abused its discretion by admitting the Day in the Life video as well as the video depicting fluid leaking from Story's head wound. Specifically, Smart argues that the videos' "probative value was substantially outweighed by the danger of unfair prejudice"[4] because such "day in the life accounts" are generally intended to "arouse passions, to garner sympathy, and to influence a jury"; the videos

---

[4] We disagree with the State's assertion that Smart also challenges the videos' admission under other grounds listed in Texas Rule of Evidence 403. *See* Tex. R. Evid. 403. Nevertheless, after reviewing the record, we conclude that—to the extent that he intends to raise such arguments—they were not preserved for appellate review. *See Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (explaining that complaint on appeal must comport with objection at trial).

were "unrelentingly gruesome"; their "unintended effect" was to prejudice the jury against him; and, although they were "certainly relevant to Mr. Story's cause of death," their exclusion would not have rendered the State's case "significantly less persuasive."

Both videos, each of which is in color and approximately one-minute long, are silent. The Day in the Life video shows Story—emaciated, immobile, and with his legs splayed and a bandage around his head—being tended to and repositioned in bed. In the video, he stares blankly to the side, and his mouth hangs open. He is unclothed but for a sheet covering his groin and lower abdomen. The second video depicts a close-up of a wound behind his ear, from which, Dr. Ratcliff testified, CSF or pus appears to be leaking.

Prior to Tiffiney's testimony, the trial court held a hearing on the videos' admissibility at defense counsel's request. At the hearing, counsel objected in relevant part:

> [I]n this case, the 403 prejudicial value is clearly going to outweigh the probative value in regards to the elements of the offense, the State's burden of proving up those elements. Any probative value is going to be greatly outweighed by prejudicial value, the prejudicial effect. It will be, you know, like dropping a bomb on Hiroshima before World War II really got underway. So that's what it's going to be like. It will be game over.

In response to the State's assertion that the videos were highly probative to the issue of causation, counsel further argued that the State's need for the evidence was obviated by anticipated photographs and testimony addressing the videos' content, that the videos were intended to "create emotion or drive emotion," and that a compromise would be to admit only still frames from the videos. After considering the parties' arguments, the trial court denied the State's request to show the full videos and ruled, "The State will play on State's Exhibit 2 [the Day in the Life video] from one minute thirty seconds in to two minutes thirty seconds in, on State's Exhibit 24 [the close-up video] from zero minutes and zero seconds to one minute."

13

Rule 403 provides that a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Evidence is unfairly prejudicial when it has "an undue tendency to suggest that a decision be made on an improper basis." *Montgomery*, 810 S.W.2d at 389. The rule favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010); *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). Under the rule, trial courts have "considerable freedom in evaluating proffered evidence's probative value in relation to its prejudicial effect," and there should be "a corresponding reluctance on the part of an appellate court to reverse trial court decisions which admit or exclude evidence." *Montgomery*, 810 S.W.2d at 378.

In conducting a Rule 403 analysis, the trial court must balance the claimed probative force of the proffered evidence along with the proponent's need for the evidence against:

> (1) any tendency of the evidence to suggest that the case would be decided on an improper basis; (2) any tendency of the evidence to confuse or distract the jury from the main issues; (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence; and (4) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Henley*, 493 S.W.3d at 93 (citing *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006)). These factors may blend together in practice. *Gigliobianco*, 210 S.W.3d at 642.

Because the videos in this case were admitted without sound, the trial court's Rule 403 analysis is governed by the same rules as those relating to the admission of still photographs.

14

*See Alvarado v. State*, 912 S.W.2d 199, 213 (Tex. Crim. App. 1995) ("Under Rule 403, the trial court's analysis of the admissibility of a silent videotape is the same as it is for still photographs."); *see also* Tex. R. Evid. 1001(c) ("A 'photograph' means a photographic image or its equivalent stored in any form."). When reviewing a trial court's decision to admit photographs over a Rule 403 objection, we may also consider additional factors, including: "the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or in black and white, whether they are close-up and whether the body depicted is clothed or naked." *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002) (citing *Wyatt v. State*, 23 S.W.3d 18, 29 (Tex. Crim. App. 2000)). We are not limited to this list, however, and should also note "[t]he availability of other means of proof and the circumstances unique to each individual case." *Id.* Photographs are generally admissible where verbal testimony about the same matters is admissible. *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996). Moreover, a trial court "does not err merely because it admits into evidence photographs which are gruesome." *Paredes v. State*, 129 S.W.3d 530, 540 (Tex. Crim. App. 2004) (quoting *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995)).

We agree with the State's assertion that the videos were highly probative of the element of causation. *See Williams v. State*, 301 S.W.3d 675, 692 (Tex. Crim. App. 2009) (stating that "photographs had probative value in that they depicted both the crime scene and the victim's injuries"); *Gordon v. State*, 784 S.W.2d 410, 413 (Tex. Crim. App. 1990) (concluding that video had "substantial probative value" in part because it was "highly probative" of "the fact and manner of the decedent's death and the killer's culpable mental state"). During the hearing on the videos' admissibility, the State noted that no autopsy was performed on Story, that approximately six-and-a-half months passed between the collision and his death, that the videos

were taken "shortly before" his death, and that it anticipated testimony from Dr. Ratcliff that the injuries depicted in the videos were caused by the collision and resulted in Story's death. *See Sonnier*, 913 S.W.2d at 519 ("The photographs are powerful visual evidence, probative of various aspects of the State's theory of the offense including the brutality and heinousness of the offense."). The videos thus provided persuasive evidence that the collision—and not an intervening cause—led to Story's murder.

The State likewise had great need for the videos. Although Smart argues on appeal that "[a]mple evidence was adduced to establish Mr. Story's injuries and resulting cause of death" and that "[t]hose matters were not disputed," his argument overlooks the nature of videographic evidence, the State's burden to prove each element of the offense beyond a reasonable doubt, and the trial court's inability to consider evidence that had not been presented at the time of its ruling. *See Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003) ("As a general rule, an appellate court reviewing a trial court's ruling on the admission or exclusion of evidence must do so in light of the arguments, information, and evidence that was available to the trial court at the time it ruled."). Both videos were offered through Tiffiney, the State's first witness. Rather than stipulate to the issue of causation, defense counsel stated that the State was "going to get there with their photographs, and they're going to get there with their testimony." The photographs in question, however, were of Story in the hospital at the time of the collision almost seven months earlier; the videos were the only contemporaneous evidence of his condition and injuries around the time of his death. Additionally, although it was anticipated that Tiffiney and Dr. Ratcliff would testify to the nature of Story's injuries and the element of causation, "[t]he fact that the jury also heard testimony regarding the injuries depicted does not reduce the relevance of the visual depiction." *Gallo*, 239 S.W.3d at 762; *see Jones*, 944 S.W.2d

16

at 652 ("We have consistently held that photographs are generally admissible where verbal testimony about the same matters is admissible."); *cf. Sonnier*, 913 S.W.2d at 519 ("[P]hotographs are powerful visual evidence.").

Conversely, there is little evidence in the record to suggest that the jury would decide the case on an improper basis, that the videos would distract or confuse it from the main issues, that it would give the videos undue weight, or that their presentation would likely consume an inordinate amount of time or be cumulative of other evidence. *See Henley*, 493 S.W.3d at 93. While Smart characterized the videos as "unrelentingly gruesome," they depict only the consequences of his charged conduct, and a trial court "does not err merely because it admits into evidence photographs which are gruesome." *Sonnier*, 913 S.W.2d at 519; *see id.* ("[W]hen the power of the visible evidence emanates from nothing more than what the defendant has himself done we cannot hold that the trial court has abused its discretion merely because it admitted the evidence."); *see also Williams*, 301 S.W.3d at 692 (determining that trial court did not abuse its discretion by admitting photographs that "portrayed no more than the gruesomeness of the injuries inflicted by appellant"); *Gordon*, 784 S.W.2d at 413 (concluding prejudicial effect did not outweigh "substantial probative value" of video showing "close-up footage" of murder victim, including burns caused by scalding grease that had been poured over her and "bloody gaping knife wounds to her neck and back"). Indeed, autopsy photos are generally admissible, *Hayes v. State*, 85 S.W.3d 809, 816 (Tex. Crim. App. 2002), and "few, if any, pictures of murder victims will *not* be [gruesome]," *Madden v. State*, 799 S.W.2d 683, 696–97 (Tex. Crim. App. 1990) (emphasis added).

Moreover, Smart's comparison of the videos to a "seventeen-minute video montage of photographs depicting the murder victim's life, set to music from the movie *Titanic*,"

which was played during the punishment phase of a capital murder trial in *Salazar v. State*, is wholly inapt. 90 S.W.3d 330, 338–39 (Tex. Crim. App. 2002). Each video in the present case, admitted during the guilt-innocence phase, was silent and approximately one-minute long. Far from a celebration of Story's life, both videos attempted to chronicle his suffering and the decline of his health near the time of his death. Although the Day in the Life video was perhaps provocatively titled, it depicted merely a continuous recording of Story being briefly repositioned in his bed.

The videos were brief, were not overly scientific or technical, and involved matters that the jury was well-equipped to understand and evaluate. *Gigliobianco*, 210 S.W.3d at 641. The injuries depicted in the videos were alleged to have been caused by the charged offense, and the videos were therefore directly relevant to the jury's determination of guilt. *See* Tex. R. Evid. 401 (providing that evidence is relevant if it makes material fact more or less probable). Their combined presentation took only two minutes, and Tiffiney's testimony concerning their content amounted to two pages of an approximately 500-page record of the guilt-innocence phase of trial.

Neither Tiffiney's nor Dr. Ratcliff's testimony reduced the relevance of the videos or rendered them cumulative. *See Gallo*, 239 S.W.3d at 762; *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999) (recognizing that visual evidence accompanying testimony gives factfinder "a point of comparison against which to test the credibility of a witness and the validity of his conclusions"); *Jones*, 944 S.W.2d at 652 (reiterating that photos are generally admissible where verbal testimony about same matters is admissible); *Williams v. State*, 937 S.W.2d 479, 488 (Tex. Crim. App. 1996) (stating that autopsy photographs are admissible under Rule 403 "even if they merely corroborate other kinds of evidence"). Nor did

18

the photographs of Story in the hospital, which reflected his condition immediately following the collision. Even if the photographs and videos were closer temporally and in regard to Story's condition, the Court of Criminal Appeals has found that "[v]ideo recordings in general may be more helpful to a jury than still photographs" because they allow "a more panoramic representation of the physical and forensic evidence." *Gordon*, 784 S.W.2d at 412; *see Ripkowski v. State*, 61 S.W.3d 378, 392 (Tex. Crim. App. 2001) ("We have held in the past that a videotape and still photographs are not entirely cumulative of each other."); *Flores v. State*, 915 S.W.2d 651, 652 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) ("[T]he videotape was not cumulative because it offered a three dimensional perspective.").

In summation, we conclude that the trial court's determination that the probative value of the videos was not substantially outweighed by a danger of unfair prejudice was reasonable. The trial court did not, consequently, abuse its discretion by admitting them. We overrule Smart's first issue.

## II.     Victoria Orr's Statements

In his second issue, Smart contends that the trial court abused its discretion by excluding statements made by Orr that "supported [Smart's] claim that she might have committed the charged offense." He asserts that the statements, which were purportedly recorded by officers' body-cameras,[5] should have been admitted under the business- and public-records exceptions to the prohibition against hearsay. *See* Tex. R. Evid. 803(6), (8).

At trial, defense counsel attempted to question Officers Boynton and Gowers concerning Orr's statements. During his cross-examination of Boynton, counsel inquired about

---

[5] The relevant body-camera videos are not included in the record before us.

19

Orr's response when asked whether the Nitro was her vehicle. The State objected that the answer called for hearsay, to which counsel responded, "[T]his witness has already testified. We've already discussed what—they've opened the door in their own testimony. They've already asked him what Ms. Orr told them." The State clarified that it had only asked whether Orr was cooperative, and the trial court sustained the objection.

While cross-examining Gowers, defense counsel asked whether he had become aware during his investigation that residents of the Elkins house slashed Smart's and Orr's tires. At a hearing outside the jury's presence, the State objected that the answer called for hearsay, that Gowers lacked personal knowledge, and that the matter was an extraneous offense excludable under Rules of Evidence 403 and 404. Addressing the hearsay objection, defense counsel replied:

> [T]here's a clear exception to the hearsay. I haven't established the exception, but it's the business records exception. This stuff is in their reports. It's on their videos. These are records that are taken and kept in the normal course of business. When we were objecting to the hearsay of Ms. Salazar earlier, it was never to what Ms. Salazar herself was telling Officer Kennedy because that is covered by the exception. It was going to be the hearsay upon hearsay when Ms. Salazar would go into what one of the other residents told her. So it isn't hearsay – I mean, it is hearsay, but it's covered by the business records exception and the public records exception.

The State argued that counsel's question attempted to elicit hearsay-within-hearsay and that "the idea that anything written down in a report by a police officer is then a subject to the business records exception . . . isn't accurate under the hearsay rule." Following brief voir dire examinations of Gowers by both parties, in which he testified that he did not speak with Orr but that the allegations were "in the videos and reports," the trial judge stated that he was "going to sustain the objection."

20

Prior to the parties' closing arguments, defense counsel made an offer of proof in which he articulated the anticipated testimony that his desired cross-examination would have elicited:

> As you recall during the testimony of Officer Boynton, I attempted to go into statements made by Victoria Orr that were captured by his body camera . . . . [S]pecifically, I was going to address with him her statements regarding who owned the vehicle, where she denied even knowing whose vehicle it was and then ultimately admitting it was her vehicle, but that she didn't know where the keys were and she didn't know where Mr. Smart was.
>
> Also on that video, that I intended to go into with Officer Boynton was the – her reaction at the end of the video when she goes with her parents, she begins screaming and crying, and she starts yelling, they killed my dog, they beat up Jordan, they – I think those are the two things. They killed my dog, they – they beat up Jordan. And all of this was to establish that Victoria Orr was evasive with the police, that Victoria Orr lied to the police, that Victoria Orr had an emotional reaction to the incident itself and made statements regarding what she believed that the occupants of the home [on] Elkins Drive had done to her dog and to Jordan Smart.
>
> Further, for the testimony of Officer Gowers, I attempted to go into but was prevented from doing so. Going into the evidence on his body camera when he had talked to Donald Armstead, the other gentleman that was hit by the car, where Donald Armstead clearly states to Officer Gowers that he had spoken with Victor Orr who is Victor – Victoria Orr's father, where Victoria Orr, ["]Was going to take the charge.["]  And I was going to address that statement with Officer Gowers and ask him whether he investigated that statement and whether he looked into or talked to Victoria Orr's father or Victoria Orr about that. And that's the end of the offer of proof.

Hearsay is as an oral or written statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d); *Garcia v. State*, 868 S.W.2d 337, 339 (Tex. Crim. App. 1993). Hearsay is generally inadmissible except as provided by the rules of evidence or statute. Tex. R. 802. The business-records exception to the hearsay prohibition provides that records of a regularly-conducted activity are admissible under certain circumstances. *See id.* R. 803(6). The

21

public-records exception, as applicable in a criminal case, provides that a record or statement of a public office is admissible if it sets out the office's activities or a matter observed while under a duty to report—but not including a matter observed by law-enforcement personnel—and the evidence's opponent fails to demonstrate that the source of information or other circumstances indicate a lack of trustworthiness. *Id.* R. 803(8).

"When hearsay contains hearsay, the Rules of Evidence require that each part of the combined statements be within an exception to the hearsay rule." *Sanchez v. State*, 354 S.W.3d 476, 485–86 (Tex. Crim. App. 2011); *see* Tex. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."). "Inadmissible hearsay testimony does not become admissible simply because it is contained within an admissible document or transcript." *Jones v. State*, 843 S.W.2d 487, 492 (Tex. Crim. App. 1992), *abrogated on other grounds by Maxwell v. State*, 48 S.W.3d 196, 200 (Tex. Crim. App. 2001); *see Willis v. State*, 2 S.W.3d 397, 401 (Tex. App.—Austin 1999, no pet.).

We need not decide whether the body-camera footage was admissible under Rules 803(6) or 803(8) because, assuming without deciding that it was, any recorded statement by Orr would constitute hearsay-within-hearsay[6] for which Smart does not offer an exception. *See* Tex. R. Evid. 805; *Sanchez*, 354 S.W.3d at 485–86. The mere fact that a recording is admissible does not mean that its *content* is. *See Stapleton v. State*, 868 S.W.2d 781, 784–85 (Tex. Crim. App. 1993) (while audiotape of citizen's call to police department may have fallen under business-records exception, "significant requisite ingredient" was missing because tape included

---

[6] Indeed, Orr's purported statement that she intended to "take the charge" appears to have been embedded within four layers of hearsay.

double hearsay, and nobody "engaged in the police activity *had personal knowledge of the information reported by the citizen*"); *Crane v. State*, 786 S.W.2d 338, 353–54 (Tex. Crim. App. 1990) (assuming *arguendo* that jail-call recording would have been admissible, "the contents of such records are still subject to hearsay objections," and statements on recording were inadmissible hearsay-within-hearsay); *see also* S. Goode & O.G. Wellborn III, *Texas Rules of Evidence*, 2 Tex. Prac. § 803.11 (4th ed. 2023) ("If a business record incorporates a statement by a person who is not part of the regular organized activity and who thus has no 'business duty' to make the report, and the record is offered to prove the truth of the incorporated statement, the record will be treated as 'double hearsay.'"). Smart has not identified an independent exception under which the purported statements were admissible, and we will not make his argument for him. *See* Tex. R. App. P. 38.1(i); *Hall v. State*, 663 S.W.3d 15, 35 (Tex. Crim. App. 2021); *Wolfe v. State*, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017) ("[A]n appellate court is not required to make an appellant's arguments for her."); *Willis*, 2 S.W.3d at 401. We overrule his second issue.

## CONCLUSION

Having overruled both of Smart's issues, we affirm the trial court's judgment of conviction.

23

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Triana and Smith

Affirmed

Filed:  February 16, 2024

Do Not Publish